IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 03-00103-CB |
| | | CIVIL ACTION NO. 06-00627-CB |
| LEROY VIDAL JACKSON | ) | |
| Defendant/Petitioner. | ) | |

## **OPINION and ORDER**

This matter is before the Court on a motion to vacate, set aside or correct sentence filed by Petitioner Leroy Vidal Jackson, a person in federal custody. (Doc. 340.) Petitioner has also filed a motion to supplement. (Doc. 354.) In addition, Petitioner subsequently filed a motion to amend or correct the judgment (Doc. 390) as well as two motions challenging the Court's subject matter jurisdiction. (Docs. 397, 398.) Finally, Petitioner's motions have brought to light the Court's need to enter an amended judgment to reflect the sentence entered after this case was remanded for resentencing. All of these matters are addressed below, beginning with the § 2255 motion.

**Background**

*Procedural History*

Before his 2003 indictment and conviction in this case, Petitioner Leroy Vidal Jackson (hereinafter "Jackson" or "Petitioner") was indicted and convicted in this Court of possessing a firearm after having been convicted of a felony (i.e., "felon-in-possession").[1] He was sentenced to a 105-month term of imprisonment. Consequently, Jackson has been in custody since June 2001. In April 2003, while in custody, he was indicted in the underlying drug conspiracy case.

---
[1] *United States v. Leroy Vidal Jackson*, Criminal Action No. 01-00082-CB.

The indictment charged Jackson and eight others with conspiracy to possess with intent to distribute more than 20 kilograms of crack cocaine. The indictment alleged that the conspiracy lasted from about January 1, 1998 through March 15, 2003.[2] Petitioner, represented by retained counsel, Neil Hanley, went to trial on the conspiracy charge and was convicted. At the time of his initial sentencing, the Court was bound by the United States Sentencing Guidelines. Petitioner's guideline range was life; therefore, he was sentenced to life in prison. Petitioner appealed. His conviction was affirmed on appeal, but his case was remanded for resentencing in light of *Booker v. United States,* 543 U.S. 220 (2005), which rendered the United States Sentencing Guidelines advisory.

This Court resentenced Petitioner to a 240-month term of imprisonment. The resentencing order did not specify whether the sentence was concurrent with or consecutive to Petitioner's previously-imposed 105-month sentence. No appeal was taken. Several months later, however, Petitioner's counsel filed a motion to alter or amend the judgment to run his sentences concurrently. The Court denied the motion as untimely. Thereafter, Petitioner filed a timely § 2255 motion. During the pendency of the § 2255 motion, Petitioner has also filed a motion to amend or correct the judgment to run concurrently with the prior sentence, a motion challenging subject matter jurisdiction and an amended motion challenging subject matter jurisdiction.

***The Trial***

At trial, the government presented evidence that Leroy Vidal Jackson was an owner of a record company, Gorilla Records, which served as a front for his real business—buying cocaine

---

[2] The indictment also included three substantive counts, none of which included Jackson, and one forfeiture count.

and converting it to crack for sale on the streets. Numerous witnesses, most of whom were codefendants or cooperating witnesses, testified on behalf of the government about their dealings with Jackson. Patrick Benson was Jackson's supplier from whom he purchased cocaine in Houston. Billy Mitchell testified that he acted as a middle man for the Houston suppliers, selling cocaine to Jackson on numerous occasions and once came to Mobile to cook crack for Jackson. Mitchell also testified that he was a partner in Gorilla Records, the front used for the drug organization, along with Jackson and Deltrick Caldwell. Afori Pugh was a rapper with Gorilla Records. He testified that in 2001 when he needed money Jackson taught him to cook cocaine into crack. He did this directly for Jackson several times before Jackson went to prison. After Jackson went to prison, Pugh began working with Prayer and became involved in running the drug organization. Darrin Southall testified that he bought cookies of crack from Jackson two or three times a week from 1999 until Jackson went to prison in 2001. Codefendants Jerome Bush and Robert Nicholas were couriers and testified about various trips bringing kilos of cocaine from Houston to Mobile for Jackson. Ernest Battles, another codefendant, was a street-level dealer who testified that between January 2000 and June 2000 he bought approximately 40 to 50 cookies of crack from Jackson, which he broke into rocks and sold on the streets. Similarly, codefendant Andre Reed, also a dealer, testified that he bought cookies of crack from Jackson almost daily from 1999 until Jackson went to prison in 2001.

Jackson's uncle and codefendant, David Prayer, also testified against him at trial. Prayer got out of prison in March 2001, just a few months before Jackson was arrested on the felon-in-possession charge in June. Prayer saw Jackson in possession of kilos of cocaine, often when the cocaine was being cooked into crack. Before Jackson went to prison, he told Prayer where to find cash (approximately $45,000) to take care of his family. Prayer knew the money was drug

3

money, and when it began to run out he bought a kilo of cocaine from Patrick Benson and took up Jackson's drug business. Prayer told Jackson that he had contacted Benson and was going to start buying from him. Jackson told Prayer to go ahead and let Prayer know that it was okay to deal with Benson. Prayer used the same people Jackson had used to purchase, sell, transport and store cocaine.

At Jackson's request, Prayer provided a cell phone that was smuggled to Jackson while he was housed in a Texas jail. Jackson and Prayer used the cell phone to discuss their drug business. Prayer told Jackson he was dealing with Benson. Jackson said that was okay and gave Prayer advice on how to run the business. Unbeknownst to Jackson and Prayer, the government had obtained a warrant for a wiretap of certain telephone numbers, including Prayer's. Consequently Prayer's conversations with Jackson were intercepted and recorded. Three of those conversations were played at trial. In one, the two talked about Prayer waiting in Houston to hear from Benson about finding some way to get the cocaine back to Mobile. Jackson told Prayer not to transport the cocaine himself. Jackson also warned Prayer not to handle the cocaine without gloves. The concern was that the cocaine would be absorbed through his skin and would be detected in the mandatory drug testing conducted as part of his supervised release. In another conversation, Prayer told Jackson about Robert Nicholas and another associate whose cases had been nol prossed by the state. Prayer and Jackson took that as a sign the two were cooperating and opined that it was only a matter of time before the feds came after them (Jackson and Prayer). Jackson said it was time to go "old school". Prayer explained that "old school" meant "beating them up, hurting them, whatever. Whatever it took to stop them from talking." (Tr. 234.)

The government had other corroborating evidence in addition to the telephone conversations. Officer Aaron Burleson, of the Beaumont, Texas, Police Department, testified that he stopped Jackson for a traffic violation in December 2000. The stop occurred on I-10 between Houston and Mobile. Police searched both Jackson and his car. Jackson was carrying $8,000 in currency on his person. In the trunk, police found discovered an additional $15,000 inside a suitcase that belonged to Jackson. That money was packaged in 15 bundles of $1,000 each, each bundle was secured by rubber bands and all the bundles were inside a vacuum-sealed plastic bag. A pistol and a vacuum sealer box were also found in the trunk.[3] Officer Burleson, testified that he made hundreds of drug-related traffic stops and that drug traffickers use vacuum sealers to conceal the odor of drugs on currency.

The defense strategy at trial was to attack the credibility of the government's witnesses. Defense counsel attempted to impeach each of the coconspirator witnesses by pointing out inconsistencies in their testimony and by establishing that each had the possibility of a reduced sentence if they provided "substantial assistance" to the government and, therefore, had reason to lie.[4] The only witness called by the defense was Felicia Jackson, Petitioner's wife, and her testimony was only for a limited purpose. Mrs. Jackson testified that $5,000 of the money confiscated from her husband by the Beaumont Police Department recently had been returned to her.

**Section 2255 Law**

---

[3] Jerome Bush testified that he brought a kilo of cocaine in vacuum sealed bags on an airplane from Houston to Mobile.

[4] Interestingly, David Prayer, Jackson's uncle, testified that he pled guilty and agreed to cooperate because Jackson told him. Prayer thought everyone was going to plead guilty. As it turned out, Jackson was the only one who did not plead.

Habeas relief is an extraordinary remedy which "may not do service for a [ ] [direct] appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982). A defendant who has waived or exhausted his right to appeal is presumed to stand "fairly and finally convicted." Id. at 164. Unless a claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack has remained extremely limited. *Addonizio v. United States*, 442 U.S. 178, 185 (1979). Consequently, "[i]f issues are raised and considered on direct appeal, a defendant is thereafter precluded from urging the same issues in a later collateral attack. ... A defendant is, of course, entitled to a hearing of his claims, but not to duplicate hearings. The appellate process does not permit reruns." *Moore v. United States*, 598 F.2d 439, 441 (5th Cir. 1979).

In general, claims not raised on direct appeal may not be considered on collateral attack. A petitioner can, however, overcome his procedural default of claims not raised on direct appeal. The burden a petitioner must meet differs, depending upon the type of claim he raises. First, "nonconstitutional claims can be raised on collateral review only when the alleged error constitutes a fundamental defect which inherently results in the miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998) (citations and internal quotations omitted). A petitioner's burden with regard to constitutional claims not presented on direct appeal is slightly less stringent. Constitutional claims may be considered if the petitioner can "show cause excusing his failure to raise the issues previously and actual prejudice resulting from the errors." *Cross v. United States*, 893 F.2d 1287, 1289 (11th Cir. 1990). Jurisdictional issues, however, are not subject to procedural default because federal courts are of limited jurisdiction and the parties cannot by waiver or default confer a jurisdictional foundation that is otherwise lacking. *Harris v. United States*, 149 F.3d 1304, 1307 (11th Cir. 1998).

One way a petitioner may overcome a procedural default is by demonstrating that the default was due to constitutionally ineffective performance by counsel. *Cross*, 893 F.2d at 1290. To establish ineffective assistance of counsel, a petitioner "must show that his attorney's performance was deficient and that the deficiency was prejudicial." *Id.* However, "[c]onclusory allegations of ineffective assistance are insufficient" *Wilson v. United States*, 962 F.2d 996, 997 (11th Cir. 1992) (quoting *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991)). Furthermore, "it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance of counsel." *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994).

An attorney's performance may be found ineffective in the constitutional sense only if "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* 466 U.S. at 686.

> When reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate. ... Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so. This burden, which is petitioners' to bear, is and is supposed to be a heavy one. And, we are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial ... worked adequately. Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.

*Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) (internal quotations and citations omitted).

**Application of Law to Petitioner's § 2255 Claims**

*Introduction*

All the alleged errors giving rise Petitioner's § 2255 claims are set forth as ineffective assistance of counsel claims. Those claims are:

7

1. Counsel failed to object to an indictment that was fatally defective in that it charged multiple conspiracies in a single count.
2. Counsel failed to move for a mistrial based on variance between multiple conspiracies alleged in the indictment and single conspiracy proved at trial.
3. Counsel failed to object to government's intentional use of perjured testimony at trial.
4. Counsel failed to object to the government's introduction of prior consistent statements by cooperating witnesses.
5. Counsel failed to object to the government's improper closing arguments.[5]
6. Counsel failed to listen to all of the wiretap tapes to find conversations in which Petitioner repeatedly asked Prayer to stop selling drugs.
7. Counsel failed to object at sentencing to Court's failure to impose sentence concurrent with prior sentence.
8. Counsel failed to raise the foregoing errors on appeal.

*Claim 1: Counsel Did Not File a Motion to Dismiss the Conspiracy Charge*

According to Petitioner, counsel should have filed a pretrial motion to dismiss the conspiracy count because the indictment charged multiple conspiracies in a single count. Petitioner asserts that Count One of the indictment charged multiple conspiracies, rather than a single conspiracy, because it failed to allege that the conspirators conspired "together and with each other" as well as with others.[6] Petitioner's argument rests on a faulty premise. The indictment's omission of the words "with each other" is not a defect. Because a conspiracy is, by definition, an agreement among the conspirators, an indictment need not allege that defendants in a conspiracy count conspired "together" or "between themselves." *Wright v.*

---

[5] Petitioner has asserted three separate claims based on three different statements by the prosecutor. Because the claims are similar, the Court has combined them into one.

[6] The indictment does specifically allege, as Petitioner points out, that the defendants named in the conspiracy count conspired "with others" but does not allege that they conspired with each other.

*United States,* 108 F.2d 805, 810 (5th Cir. 1901). The indictment did not allege multiple conspiracies. Therefore, counsel's failure to file motion to dismiss or to seek a mistrial was neither unreasonable nor prejudicial.

### *Claim 2: Counsel Did Not Move for a Mistrial*

Petitioner argues that his attorney rendered constitutionally ineffective assistance because he did not move for a mistrial based on a variance between proof at trial and the charge in the indictment. A defendant is not entitled to relief based on a variance unless the variance is both material and prejudicial. *United States v. Richardson*, 532 F.3d 1279, 1284 (11th Cir. 2008). Here, Petitioner argues that the indictment charged multiples conspiracies while the government proved only a single conspiracy. For reasons discussed above, the indictment did not charge multiple conspiracies. Proof of a single, overall conspiracy at trial was, therefore, consistent with the conspiracy charge in the indictment. Any challenge to the alleged variance would have been rejected. Counsel was not unreasonable for failing to raise the challenge, and Petitioner suffered no prejudice.

### *Claim 3: Counsel Did Not Object to Perjured Testimony*

Petitioner argues that his attorney rendered ineffective assistance because he failed to object to the government's alleged presentation of perjured testimony. A prosecutor's knowing use of false evidence or perjured testimony violates a defendant's right to due process of law. *United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981). Such a claim requires proof that (1) that the statements were false, (2) that the prosecutor knew it and (3) that the statements were material to the conviction. *United States v. Bailey*, 123 F.3d 1381, 1396 (11th Cir. 1994). Of course, to prevail on an ineffective assistance of counsel claim Petitioner must also demonstrate that his counsel was unreasonable for failing to discover and raise this due process claim. Here,

Petitioner asserts that Billy Mitchell committed perjury when he testified that he (1) had no plea agreement with the government and (2) had not been offered anything in exchange for his testimony. The first statement clearly was not false. Mitchell did not plead guilty and therefore had no plea agreement.[7] If the second statement (no promises in exchange for testimony) was false at the time--and there is no evidence that it was[8]--that is not a fact that defense counsel could have known. Consequently, counsel's representation was not unreasonable.

Furthermore, the underlying due process claim could not succeed because the alleged false testimony was not material to Petitioner's conviction.

> When a government lawyer elicits false testimony that goes to a witness's credibility, we will consider it sufficiently material to warrant a new trial only when the estimate of the truthfulness and reliability of the given witness may well be determinative of guilt or innocence. In other words, the materiality element is satisfied if the false testimony could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. The false testimony is deemed material if there is a reasonable likelihood the false testimony could have affected the judgment of the jury.

*United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010). Even if defense counsel had proved that Mitchell had a plea agreement or expected favorable treatment in exchange for his testimony, it would not have made any difference in the outcome for two reasons. First, Mitchell was thoroughly impeached by defense counsel. On cross examination, Mitchell admitted that he was a drug dealer who used several aliases, that he had several prior convictions, that he had an outstanding warrant against him for a weapons conviction (for which no action had been taken), that he had not been charged in this district for his part in the conspiracy, that he had not been

---

[7] He was indicted in a separate a drug case in the Western District of Louisiana, went to trial and was found guilty.

[8] A downward departure motion was filed several months later in Mitchell's case, but that was subsequently filed does not prove that it was promised.

10

charged for money laundering or tax evasion and that he had given prior inconsistent statements about his dealings with Jackson. (Tr. 69-77.) It is not reasonably likely that additional impeachment evidence would have changed the jury's decision to believe or disbelieve Mitchell. Second, it is highly unlikely that Mitchell's credibility—or lack thereof—swayed the jury's verdict because the other evidence against Jackson was overwhelming.

### *Claim 4: Counsel Did Not Object to the Government's Use of Prior Consistent Statements Contained in Witnesses' Factual Resumes*

Jackson argues that the government improperly introduced the factual resumes from witnesses' plea agreements as evidence of prior consistent statements and that counsel was ineffective for failing to object. Jackson points to case law holding that prior consistent statements made in a plea agreement cannot be introduced to rebut claims of recent fabrication. In this case, the government did not introduce the factual resumes to rebut claims of recent fabrication. Rather, the defense put the factual resumes at issue, using them to impeach two witnesses—Earnest Battles and Clinton Prayer—by pointing out "inconsistencies" between the description of events in their factual resumes and their testimony at trial. (Tr. 195-98, 264-66.) On redirect, the government referred to the factual resumes in an effort to demonstrate that there were no real inconsistencies. (Tr. 204-08, 288-90.) Because there was no basis for trial counsel to object, his failure to do so was neither unreasonable nor prejudicial.

### *Claims 5, 6 & 7: Failure to Object to Prosecutor's Improper Closing Arguments*

In closing arguments, the prosecutor made three statements that Petitioner claims were so unfair and prejudicial as to violate his right to due process of law. According to Petitioner, the objectionable statements were: (1) Petitioner was a "choir boy" and a "convict," (2) Prayer testified that Petitioner ordered Prayer to kill a drug courier named Robert Nicholas and (3) defense counsel was "making things up." Each of these statements is the subject of an

11

ineffective assistance of counsel claim. Therefore, the question is whether counsel was unreasonable for failing to object and, if so, whether Petitioner was prejudiced by counsel's omission.

In some instances, improper closing arguments by a prosecutor may give rise to a prosecutorial misconduct claim. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

> To establish prosecutorial misconduct, (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant. A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different. When the record contains sufficient independent evidence of guilt, any error is harmless.

*Id.* (internal quotations and citations omitted). Remarks must be considered in the context of the entire trial, and counsel is allowed to draw inferences "fairly suggested by the evidence or by matters of common knowledge outside the evidence." *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984).

The "choir boy" comment was made in response to the defense counsel's suggestion that Petitioner was innocent because the conspiracy began after Petitioner was in prison and Petitioner was not a part of it. The prosecutor stated, "Well, if choir boy over here had nothing to do with this and it didn't start until then well, boy, what about Aaron Burleson? Do you remember him? December 2000?" (Tr. 487-88.) The prosecutor's characterization of defense counsel's argument was not unreasonable. Furthermore, since the evidence clearly showed that Petitioner had been convicted of a firearms violation and was in jail during part of the conspiracy, it was not improper to refer to him as a "convicted felon." (Tr. 486.)

The prosecutor's comments about Prayer's testimony and the murder of a witness were as follows:

> But, listen. . . . what an attorney says is not evidence. but just what's so interesting about this is they're talking, he tells him to go what? I guess we're

going to have to even take more room. To go old school on who? Nicholas. That
he's going to have to beat him up, kill him so Nicholas won't testify.

(Tr. 493.) The conversation about going "old school" on Nicholas was one of the tape-recorded conversations between Petitioner and Prayer played for the jury. Nicholas had been arrested but the case against him dismissed, a sign that he was cooperating with police. In response to that Petitioner said they needed to go "old school" because it was just a matter of time before the feds came after him and Prayer. Prayer had testified that going "old school" meant "beating them up, hurting them, whatever." The prosecutor's inference that "whatever" could mean whatever it took to silence a potential witness, including murder, is not farfetched. Moreover, the prosecutor prefaced his remarks with a reminder that his statements were not evidence.

The prosecutor argued that "defense counsel wants to make up things as we go along." (Tr. 489.) Petitioner argues that this remark improperly characterized defense counsel's impeachment of witnesses. The gist of the prosecutor's argument was that defense counsel was choosing to ignore evidence unfavorable to his client and, by highlighting only favorable evidence, was presenting a case that did not exist. Taken in context, that argument was not unreasonable.

In sum, the prosecutor's arguments were not improper. Each was a reasonable inference based on evidence or a reasonable response to defense counsel's closing arguments. Moreover, even if the statements could be considered improper, any error was rendered harmless by the Court's curative instruction that "anything the lawyers say is not evidence in the case." (Tr. 499-500.) *See United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990) (improper comments in closing argument cured by court's instruction that lawyers' statements are not evidence). Counsel's failure to interpose a meritless objection to the prosecutor's closing arguments was

13

neither unreasonable nor prejudicial and does not amount to constitutionally ineffective assistance of counsel.

### Claim 6: Failure to Listen to Wiretap Tapes for Exculpatory Evidence

Petitioner contends that defense counsel failed to discover exculpatory evidence because he did not listen to all of the wiretap tapes. If counsel had, Petitioner claims, he would have discovered that Petitioner told Prayer numerous times to stop selling drugs. Even assuming *arguendo* that such evidence existed, counsel's failure to discover it and introduce it at trial was not prejudicial for two reasons. First, it is unlikely that admonitions not to sell drugs would be taken seriously since other wiretap conversations deal with the specifics of running the drug business. Second, these conversations took place two or three years after the conspiracy began. Even if Petitioner told Prayer not to sell drugs in 2001 or 2002, it does not negate the substantial, if not overwhelming, evidence that Petitioner was an active member of the conspiracy up to that point.

### Claim 7: Failure to Object to Consecutive Sentences

Petitioner argues that counsel was ineffective for failing to argue for a concurrent sentence or requesting credit for time served. According to Petitioner, under § 5G1.3 of the United States Sentencing Guidelines "at the minimum he was entitled to serve his sentence concurrent with credit for time served already [in the] related case already being served [i.e. firearms conviction]." (Doc. 346 at 16.) What Petitioner fails to acknowledge is that the sentence imposed in this case was the result of the Court's exercise of its post-*Booker* discretion to deviate from the Guidelines. Petitioner was originally sentenced to life because that was the only sentence permitted under the then-mandatory Guidelines. *Booker,* which was decided while Petitioner's case was on appeal, held that the Guidelines were no longer mandatory. When the

14

case was remanded for resentencing, the Court decided, for reasons stated in the resentencing order, not to follow the Guidelines. Instead, the Court imposed a sentence it deemed appropriate based on all of the sentencing factors listed in 18 U.S.C. § 3553(a). The Court was not required to impose a life sentence, nor was it required to impose concurrent sentences or to give credit for time served on a prior conviction. In fact, the Court did not intend to impose concurrent sentences or to give credit for time served.[9] Counsel was not unreasonable for failing to object to the Court's sentence, nor did his omission prejudice the Petitioner.

*Claim 8: Failure to Raise Issues on Appeal*

Petitioner argues that counsel rendered ineffective assistance by failing to raise the trial errors asserted in claims 1 through 7 on direct appeal. Because the Court has found that the underlying claims of error lack are meritless, counsel's failure to raise them was neither unreasonable nor prejudicial.

*Conclusion*

Petitioner's numerous ineffective assistance of counsel claims are without merit. Petitioner is not entitled to relief on any of the claims raised, and his § 2255 motion is hereby **DENIED**.

**Certificate of Appealability Denied**

Rule 11 of the Rules Governing Section 2255 Proceedings requires that this Court "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." "A certificate of appealability may be issued only where the applicant has made a 'substantial showing of the denial of a constitutional right.'" *Hardwick v. Singletary*, 126 F.3d 1312, 1313

---

[9] Defendant continued to engage in criminal conduct while serving his sentence in the firearms case. For that reason, he does not deserve to have any time served on his earlier sentence credited to his sentence in this case.

15

(11th Cir. 1997). This standard is "materially identical" to the standard governing certificates of probable cause under the former 28 U.S.C. § 2253. *Id.*; accord *Slack v. McDaniel*, 579 U.S. 473 (2000). In the context of certificates of probable cause, the Supreme Court has defined the requirement of "a substantial showing of the denial of a federal right" to mean that the applicant must raise an issue that is debatable among jurists of reason. *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983). None of the claims raised in petitioner's § 2255 meet this threshold. Accordingly, the certificate of appealability is **DENIED**.

**Other Pending Motions**

In addition to the § 2255 motion, Petitioner has filed several motions that must be resolved.

The first is a motion to supplement the record with a copy of the docket sheet from criminal case against witness Billy Mitchell in the Western District of Louisiana. (Doc. 354.) That motion is **GRANTED**.

Next, Petitioner has filed a "Motion to Correct or Amend the Order of Judgment and Committal Pursuant to Rule 36, Fed. R. Crim. P." (Doc. 390.) This motion raises an issue similar to a claim raised in the § 2255 motion. Petitioner insists that the judgment is in error because it does not reflect that the sentence in this case is to run concurrently with the previously-imposed sentence. For the reasons stated, *supra* at 14, the Court has rejected this contention. The motion is, therefore, **DENIED**.

The two final motions (Docs. 397 & 398) are quite similar. Both question whether Petitioner was actually indicted by the Grand Jury, and both purport to challenge the Court's subject matter jurisdiction. Because these motions simply provide additional grounds to vacate Petitioner's conviction, they are properly viewed as motions for leave to amend the § 2255

motion. As such, they are **DENIED** as untimely because they were filed more than one year after Petitioner's conviction became final.[10]

**Amended Judgment**

The Court has discovered that, due to oversight, no amended judgment was entered in accordance with the sentencing order dated October 17, 2005. The Clerk of Court is directed to enter an amended judgment reflecting the sentence imposed upon resentencing. The order shall be dated *nunc pro tunc* October 17, 2005.

**DONE** and **ORDERED** this the 6th day of July, 2010.

s/*Charles R. Butler, Jr.*
**Senior United States District Judge**

---

[10] Petitioner's conviction became final in 2005 when the time for appeal of his resentencing expired. These motions were filed in 2010. Generally, motions for relief under § 2255 must be filed within one year after the conviction becomes file. In some circumstances untimely amendments may relate back to the date of the original motion, but "the untimely claim must have more in common with the timely filed claim than the mere fact that they arose out of the same trial and sentencing proceedings." *Davenport v. United States*, 217 F.3d 1341, 1344 (11th Cir. 2000).